May it please the court, the liability judgment in this case is directly contrary to this court's independent contractor rule. That will be my focus this afternoon because that argument moots the other arguments in our brief. We believe strongly in our damage arguments, but I will leave those to the briefs. I do want to leave a little time to talk about plaintiff's counsel's improper inflammatory comments throughout the course of the trial. So to begin with the independent contractor rule, as your honors know, I know you're familiar with the facts, this was a very simple job. But Talos did not have the expertise or the manpower to do this job. It was simply to remove corroded steel pipe from its offshore oil platform. So it hired a company, DLS, that held itself out as expert in doing this type of work. And DLS scoped the job and came up with the procedure to do the job, which was simply cutting the pipe with a welding torch and then lowering the cut pieces with a rope to another area 40 foot below. Now I want to focus on the particular manner in which DLS did this work that made it unsafe and caused the accident. Because when we get to the independent contractor rule in just a moment, we'll see that that is what is of critical importance. So the first thing that DLS did was it told its employees that when they lowered the cut pipe to do so gently, but instead the DLS employees would push the cut pipe off of the scaffolding so that it would free fall until it took up the slack in the rope, thereby shock loading the rope. The second thing that the DLS employees did is that they simultaneously were cutting pipe and lowering pipe. This was directly against the instructions of DLS against their safety protocol, who had told them never cut and lower at the same time. And the third thing they did, again, directly against DLS's own safety protocol instructed to its workers, DLS said never lower a cut piece of pipe over another coworker. And at the same time, if you're below, never enter under a suspended load. But the DLS workers broke both of those rules, too. This is the particular manner of work that made this job unsafe, that contributed to the accident. Now, that's not my gloss on what happened. DLS did its own investigation after the accident, and it issued a report. That report is called the Lessons Learned Report. It's in the record at 13480. And in that Lessons Learned Report, DLS has a section entitled Major Factors Leading to Incident. And the first major factor that DLS itself lists is its own employees, and I quote, not following safety protocols. That's number one. DLS has another section in its report entitled What Happened? And their DLS explains that because pipe was being cut and lowered at the same time, when it was being cut, there were sparks that were raining down on the employees below, one of them Mr. Jackson, the decedent. And because pipe was being cut, he knew it was being cut because he had sparks being showered down on him, he thought, well, pipe cannot be lured because we don't lure pipe when we're cutting pipe. So he thought it would be safe to rush into the barricaded area to escape the sparks. Of course, pipe was being lured, and it fell on him, and that's what caused the accident. Now, under the independent or the negligent acts of the independent contractor or its workers, that caused this accident. Here, this is reinforced by the plain language of the contract. So, are you saying that the jury never should have even been allowed to consider the facts in terms of what happened, that as a matter of law, it should have been determined that there was no responsibility? Yes, Judge Graves. We do believe that this case should have been dismissed on a motion for summary judgment, but when it wasn't dismissed as on a motion for summary judgment, and the plaintiffs had no evidence to satisfy any exception to the independent contractor rule, and I'll get to those exceptions in just a moment, the trial court should have granted motion as a judgment as a matter of law. And that's the error we're complaining of here. I'm sorry, Judge, the decision. It was DLS's decision to use the rope. TALUS knew of that decision, but it was DLS's decision to use the rope. And what the DLS witnesses testified to was that this was the way that they always did this job, that it was common when you had cut pipe to remove from an offshore oil platform to use rope just as they did here. So the contract in this case, I'm sorry. Now that was not part of the normal protocol, but that is what they did here. In fact, Mr. Menzer, who was one of the employees up top, testified that he did that, and that in fact at the time of the accident, that was being done when this accident occurred. Again, directly against DLS's own safety protocol. Now the contract in this case reinforces the independent contractor rule. It says that the contractor here, DLS, has the authority and right to direct and control all of the details of the work. The company, TALUS, being interested only in the results obtained. That's the master service agreement at paragraph 5A. The bridging agreement in paragraph 2 says that the contractor must provide employees who have the skills to provide the work in a safe manner. So the contracts reinforce the independent contractor rule. Now there are three exceptions to the independent contractor rule. The first is if the work is ultra-hazardous. The second is if the owner exercises operational control over the operation. The third is if the owner authorizes the unsafe work practice. Here the plaintiffs concede the first two. Their argument is only the third. That is, their only argument to meet some exception to the independent contractor rule is that TALUS authorized the unsafe work practice. What this court instructs is that in analyzing that question, we look at the particular manner of the way the work was done. That's why I started with the particular manner of the work that caused the accident. In fact, this court in the Coleman case, in the Davis case, in the Echeverry case, it uses that phrase, the particular manner of work. In fact, this court italicizes that phrase to emphasize that for this exception, we're focusing on the specific way the work was done that caused the accident. Another phrase the court uses in these opinions is the quote, specifics of the occasion. That is, what was being done specifically at the time of the accident that caused the accident. Well, in this case, there was an agreement to use TALUS safety manual in the JSA form of TALUS, right, for the work on the platform. Your Honor, there was a lot of debate about this. In fact, either safety manual could have been used. What TALUS said is, you have to use ours at a minimum, but if you have an equivalent safety manual, that can be used. In fact, DLS was using its own safety manual. Mr. Tortomase, the head supervisor of DLS, testified that the reason that he didn't expect Mr. DeLue, the supervisor on the job, to ever read the TALUS manual was because the DLS manual covered it all. So that's the answer to the manuals. Here in this case, coming back to the exceptions to the independent coverage. So that fact is undisputed? Is that what you're saying? It's undisputed that the DLS manual was used even though there was an agreement to use the TALUS manual? It's undisputed that the DLS manual was being used. Yes, Your Honor, that's correct. That was Mr. Tortomase's testimony. He's the supervisor for DLS. You cited the Coleman case, and it talks about generally tracking the instrumentality that caused the injury. Isn't the instrumentality in this case the rope? Your Honor, if we want to focus on the rope, the rope was the decision of DLS, the rope was provided by DLS. There is no evidence in this record that any TALUS employee ever even touched the rope. So if we focus on the rope, that doesn't help meet an exception to the independent contractor rule. Didn't TALUS have to approve use of the rope, and didn't it in fact purchase the rope? TALUS did approve use of the rope, but it wasn't its decision. It was DLS's decision, and DLS purchased and brought the rope. DLS, Mr. DeLue, I believe it was, testified he came to the platform with two boxes of rope. When you say it wasn't its decision, didn't you also say it approved the use of the rope? Well, it signed off on the use of the rope, but Your Honor, remember ... Well, signing off means something, doesn't it? Well, it means something, but what it doesn't, and this is the critical question, what they would have to show is that TALUS authorized the particular manner of work that made it unsafe. And here, the particular manner of work wasn't using a rope. Nobody argues that using a rope was unsafe. In fact, DLS, their testimony is that's the way they always did the job, is with rope. What made it unsafe, the particular manner of work that made it unsafe was simultaneously cutting and lowering pipe, was lowering pipe over a coworker, was a coworker entering a barricaded area under a suspended load, was pushing the cut pipe off the scaffold so that they shock-loaded the rope. TALUS didn't know ... My concern when I'm hearing all that is, is you began by telling me that there never should have been a jury trial. Here there was one, which lasted for, what, seven days or so? Yes, Your Honor. And the jury did apportion fault. I mean, you're telling me that it had to, it wasn't just what they approved as to how the work should be done, but it was what DLS did, which varied from what should have been done. And that's what a jury had an opportunity to do. Everything you're telling me, the jury heard, I assume. Well, Your Honor, the jury heard a lot of inflammatory comments that we believe explain the verdict, as well as the runaway damage verdict. What this court, I believe, is left with is to determine whether there's any evidence in the record that supports an exception to the independent contractor rule. Here, there's no evidence that TALUS even knew about the particular manner of work that made it unsafe. All those things I just went through. An owner cannot authorize what it doesn't know. And so there's no evidence in this record to support an exception to the independent contractor rule. And I guess for me, though, what that says is that argument, the jury heard. The jury heard the evidence. So the jury could have determined that zero fault should be attributed to TALUS. It didn't do that. You're right, the jury heard it. But, Your Honor, we're still left with finding some evidence to support an exception. And in this case, there is none. And I believe the jury came out the way it did was because it was acting on passion and prejudice. In the brief time that I have left, I want to turn to that because it's important. Here, the Plaintiffs' Counsel demonized TALUS, calling it a convicted felon over and over and over again. Now, they've tried to argue that this was appropriate under Federal Rule of Evidence 404. If a defendant is making a defense of an accident, then you can introduce evidence of a felony conviction. That was not how they used this here. They used it to brand TALUS as a convicted felon to demonize it. But it's worse than that because if you're going to argue a felony conviction, you have to prove it. You will search in vain in this record for any evidence of a felony conviction. I searched. There is none. What there is is there's a footnote in their brief, footnote 248, where they claim that witnesses admitted a felony conviction. I invite your honors to read the testimony there. What you will see is the plaintiff's attorneys referring to a felony conviction, but not any witness referring to a felony conviction. In fact, the witness that they are citing most, Mr. Spinks, who is the corporate representative of TALUS, he was asked the question point blank at 10-923, and he said, I knew there was an issue with a previous hot work permit, but not with, I didn't know there was any felony conviction. And I'm going to make just one last comment and then save the rest of my time. It's even worse than that. We did file a motion in limine to keep the felony conviction out. We attached to our motion in limine the only thing that even suggests a felony conviction, which was a press release from the Eastern District of Louisiana referring to an incident. Are you appealing the denial of the motion in limine? No, we're not, your honor. But I make this point because that is the only suggestion in the record that there is a felony conviction, but it was of a different company. It was of TALUS's, a company that TALUS acquired in 2013. The felony conviction that is only referred to in this press release is of ERT, another company. It could never be, even putting aside everything else, it could never be appropriate. Your honor, I'm giving you some leniency, but your time has expired. Thank you very much, your honor. I'll save the balance of my time. May it please the court, your honors. Andy Duprey on behalf of the Appellees, Ms. Anika Warner on behalf of YJ, and Ms. Vantrese Jackson, who are respectively the minor son and surviving spouse of the decedent, Walter Jackson. The basic overview of this incident is pretty straightforward. Mr. Jackson was working on the plus 10 deck while the pipe was being lowered from a rope above him. The rope broke, the pipe fell, it hit his head and took his life. This happened, as I will get into in very great detail, because TALUS authorized a host of unsafe work practices, none of which I heard referenced in the presentation just now. A jury in the Western District of Louisiana found TALUS negligent, assigned an 88 percent fault and 12 percent to DLS, and assigned damages. I heard no argument on the damages. We'll rest on our brief on that point as well. We think the district judge applied maximum recovery correctly, citing precedents from Louisiana. The main challenge that has been presented today is on the independent contractor rule. Well, I will jump right to that portion of the argument I prepared today, and we'll get right into it. Louisiana law imposes liability upon a principal if he authorizes unsafe work practices by his so-called independent contractor. This Court's precedents in Coleman and Etchevehry ask for some specificity on what was authorized that was unsafe. Your Honor, we've got it here, and I'm happy to start with the documents themselves. The TALUS DLS MSA, which is Defense Exhibit 53 in the record, is the source of that independent contractor provision. If you look at that document at paragraph 22, that document says we have a separate bridging agreement with DLS. If there's any conflict between this MSA and the bridging agreement, go with the bridging agreement. Okay? So we have an independent contractor provision that's going to have to yield to the bridging agreement. The bridging agreement then says in paragraph 5, and for the record, the bridging agreement is Defense Exhibit 54, it says in paragraph 5, use TALUS's JSA form. So we're left with the ultimate conclusion, the JSA form, to the extent it is inconsistent with the MSA, it controls as a matter of contract. So we look at the JSA form. That's Plaintiff's Exhibit 1 in the record. The JSA form says on page 1 that TALUS's person in charge here, that was a man named Jeremy Bork, his job is to go walk the job site, physically visit it, and ultimately approve the JSA. The JSA, as I'm sure your honors have seen, has numerous pages on it which address what hazards are present on the job site and what are the mitigation measures that we're using to address those hazards. The threshold problem in this case, your honors, Jeremy Bork didn't physically visit the job site. Federal government so found in a report. He ignored the very first requirement of approving this JSA. Nevertheless, the term, the term that came out at trial is pencil whipping, when you just sign it and you don't do any meaningful work to investigate what you're doing. He signed the JSA. He approved the procedures set forth in the JSA. Was he the PIC? Yes, your honor, he was. He authorized the work practices set forth in the JSA. And so he didn't walk it, he didn't realize the risks presented in this. What were those risks? None of which I heard in our friend's presentation on the other side. The very first presentation here is that the very first error is that it involved cutting and lowering pipe down to this 10 plus deck that you've heard about. The 10 plus deck is out of service. Talos took it out of service years before. As a result, it has a half-hearted barricade on it, something that you can easily slip through, go around. There's photos of it in the record. The point though is, because it's out of service and there's this thing, this barricade, Talos was required, and it's in the record not only from its own corporate representative, Mr. Spinks, but it's through the testimony of Mr. Ziegler, our expert. Talos had to issue a cross-barricade permit every time someone was going to cross that. Why? To address fall hazards. If you look at the JSA on page 2, there is a section for risk of falling or dropped objects, and there's a big blank. Are you restricting access to the site? It's not checked. They didn't restrict access to the 10-foot deck, which . . . It's even worse than that. The first answer, Judge Clement, is any time someone needed to cross it, you needed a permit, which means the entire job was designed to where you would casually ignore the barricade, cross over, and Jeremy Bork didn't issue a single permit for this. So . . . Sure. It's tied into this, Your Honor. The cross-barricade permit as a threshold matter, our expert, Mr. Ziegler, so testified, if you had done the cross-barricade analysis, you would have realized the job is untenable. You can't have people going back and forth. You should have entirely restricted access to prevent the risk of falling objects. That's Mr. Ziegler's testimony. It went to the jury. Also, at the record, at 10943, their own corporate representative admitted they authorized an unsafe work practice by doing this. To your point, though, Joe, not only did he authorize the work to proceed, ignoring Talos's undisputed obligation that they had to issue the cross-barricade permit, he authorized hot work to proceed without ever doing the hot work permit, which is tied into this because hot work involves sparks, which would have involved sparks falling down to the 10-plus deck. If you look in Talos's brief, even they admit Mr. Jackson probably had to go on the other side of this barricade to avoid falling sparks. But if the hot work permit, if that analysis on the hot work permit is done, it would have only reinforced the conclusion of the cross-barricade permit. As Mr. Ziegler has testified, nobody should have even been allowed here. Access should have been entirely restricted. And only to the extent you would allow anybody to cross this barricade, it should have been in very limited instances. But that was impossible because of the way the job was designed. Every time a pipe would come down, and I know they're going to say, you shouldn't be there when the pipe is coming down, it doesn't matter. The threshold duty is to allow anything. Again, questions that went to the jury. I'm not denying that DLS was found negligent, and we haven't appealed their finding of negligence. But the fault allocation between DLS and Talos, that's squarely a factual matter entitled to a substantial amount of deference. But back to your question, Judge Clement. It should have been that access should have been really restricted, not with a fake, I say that charitably, a fake barricade that is supposed to be ignored as part of the job. It only should have been, okay guys, pipe's lowered, I'm issuing a new cross barricade permit, no hot work going on pursuant to the hot work permit rules, go ahead and cross, Mr. Jackson, get it, go back. This whole job was designed to be casually back and forth over the barricade. And that's a result of the JSA. The JSA that is signed by Talos's Jeremy Bork. If that is not the authorization of unsafe work practices, I don't know what is. Um, we see talk in the briefs of Bujold about whether you have to adopt some independent duty. You'll see that in the briefs. They already have a duty under Louisiana law not to authorize unsafe work practices, which is exactly what they did. And that's all over this trial record. Some of the other points that I heard that I wanted to follow up on, I heard talk that the rope was shock loaded. That is, not only is that incorrect, but the jury heard a substantial amount of testimony about why it's incorrect. This testimony of the rope being shock loaded came from Mr. Mincer, who was a welder. He wasn't even the one lowering this rope. That was a man named Byron Davis. Mr. Mincer is over there doing his hot work. Byron Davis has got the rope. This rope, where's the testimony that Byron Davis shock loaded the rope? Zero. Where's the testimony that somehow the rope was shock loaded from an expert? Zero. Their own expert, Mr. Shelton, whom you'll see in the record, admitted he had done no calculations that this rope was ever shock loaded. In fact, his testimony is incredible because there were huge custody issues on the rope Talos gave him to look at and ascertain, excuse me, what caused this rope to break. For one thing, the rope itself was 1,200 feet. Mr. Shelton only had a 50-foot piece and a 20-foot piece. These pieces apparently had sat in the bottom of the ocean for who knows how long. Talos had custody issues. They kept them in a trash bag labeled junk. I say this all to point out the jury had a substantial amount of reason to reject this notion that the rope was somehow shock loaded and that that had anything to do with this. The notion, we hear other notions from them in their briefs about, well, DLS, their welder, somehow shouldn't have been welding at the same time or shouldn't have been cutting at the same time. I'm sorry. Again, that risk would have been ameliorated by Talos doing its undisputed duty to issue hot work permits and issue cross barricade permits. It did not. All of those reasons support the jury's allocation of fault to Talos of 88% and 12% to DLS. I see I have a lot of time left here. I'll answer any more questions on this negligence stuff before I maybe use it on some other items. You don't have to use it, but maybe I won't use it all, Your Honor. The only other points I wanted to, I guess, touch on since we're here. This notion of prejudicial comments, about 98% of that is waived and is subject only to plain error review. And unfortunately, plain error review is essentially the most exacting review this court has. You have to show something incredible to meet it, as many criminal defendants have unfortunately discovered. By and large, these remarks do not error review. The only one we heard a discussion of a minute ago is the fact that we called them a felon. Well, let me be clear on that. They are a felon. They changed their company name, but they were essentially convicted and pled guilty in the Eastern District of Louisiana for violating hot work regulations. Why is that relevant? Well, this speech I told you about, that they didn't issue the hot work permit, they had the audacity to go to this jury and tell them, we did issue the permit, but it blew away in the wind and got lost in the Gulf of Mexico. That's a fanciful notion. At one point, Judge Kane called it the dog ate my homework excuse. And the reason it's so fanciful is because there would have been not only a hot work permit attached to the back of the JSA, that's the one that blew away, there would have been another one in the office. How many hot work permits were disclosed at trial? Zero, which means they were not being honest to the jury. We used their prior felony conviction for violating hot work regulations to show a lack of accident, i.e. this hot work permit didn't accidentally blow away. You never had it. I realize, and if you read the record, their corporate representative does squirm and refuses to admit it, but we certainly had a reasonable basis to raise it and to litigate it. The fact that he won't admit it doesn't exempt them from it being proper evidence in the case. Um, the only other item I wanted to touch on here today was something that was in the briefs on the damage lines. I saw a substantial amount of argument that they were relying on this court's 1980 decision in Croce to claim that our mental anguish blanks should not have been separate from our loss of companionship and affection blank. I wanted to touch on that. First off, that issue is moot as to Ms. Anika Warner and YJ because their loss of love, companionship, and affection blank all on its own is greater than the amount that the district judge remitted. So even if they didn't have the mental anguish blanks, it wouldn't matter. Judge Kane's remitted her would still be proper. So it's moot as to them. Um, in terms of Ms. Jackson though, uh, it is proper and I, I just want to get into why. After the, this court rendered its ruling in 1980 in Croce essentially because there was not Louisiana law on the issue. Since then, however, most importantly in 2006, the Louisiana Supreme Court rendered a decision known as Hill versus shelter mutual insurance. That's nine 25 Southern seconds, six 91. I want to read a quote from that to your honors. The elements of damage for a wrongful death action are love of loss of love, affection, companionship, services, support, medical expenses, and funeral expenses. Period. New sentence. Additionally, the courts have allowed damages and wrongful death actions for mental pain, suffering and distress resulting from the death of the victim. That holding in 2006 since then the Louisiana third circuit in a case called recall, which you guys have probably seen in the briefs. Uh, in that case they said, yes, they're separate. It's okay to have them separate writ denied by the Louisiana Supreme Court judgment stands. Uh, the Louisiana fourth circuit has said the same thing in a case called bro. Of course, defense took a writ to the justice. Piper Griffin on that court writes a special concurrence to the writ denial and says, look, the fifth circuit's decision in Croce does not accurately represent Louisiana law. That's why we're denying the writ. Um, I think that's important because that shows the state of Louisiana law on that particular issue, that there is a consensus under Louisiana law, certainly from Louisiana Supreme Court on what the answer to this is. If, if your honors feel a little conflicted about the rule of orderliness, I would suggest you shouldn't be. But if you are, it's the classic kind of thing where you would send that to the Louisiana Supreme Court. Although I don't think you need to, I think you can simply affirm as it is. But if there's a conflict, I would understand why you would feel that that should be their decision. Um, I think that, uh, I've covered everything I wanted to with your honors. Um, if you have any questions, I give the balance of my time back to the court. Thank you. Thank you, counsel. Roboto? On damages, very briefly, the argument that we made that the verdict form incorrectly asked for two elements of damages where there should only be one is not mooted by the remediator. Judge, the trial judge specifically indicated that he was not remedying this error. He did not agree. He did not follow the Fifth Circuit's holdings in Crochet and Transco. Moreover, we're entitled to a seventh, under the Seventh Amendment, to the jury determining damages. This error could not be fixed by the trial judge. But what do you say about Hill and Brough, the two cases he referred to? There, there is a split, a shallow split among the Louisiana Intermediate Circuit Courts of Appeal. The Supreme Court has not spoken to this issue. And so, this court's approach, under the rule of orderliness, is that it must follow its own opinions unless there is a unanimous or near unanimous intermediate appellate decisions from the state. We don't have that here. So, Crochet and Transco are controlled. But we have some intermediate decisions. What, what, what don't we have? We don't have, they're not unanimous. The Louisiana First Circuit has repeatedly agreed with this court, and for good reason. In a wrongful death case, a plaintiff's mental anguish claim is the loss of affection of their loved one. There isn't two different elements of damage. That's why this court found there can only be one line on the verdict form. Just as the Louisiana First Circuit, there is no Supreme Court decision to the contrary. I do want to move— Was denied in those cases. Doesn't that say something about the view of the Louisiana Supreme Court? No, Your Honor, I would disagree respectfully. The Louisiana Supreme Court functions as the U.S. Supreme Court in its writ granting. It doesn't exist to correct error. It only settles unsettled questions of law. And here, with a shallow circuit split, it makes perfect sense that they declined to take the issue. I do want to address the merits, because to hear my friend's argument on the other side, you would think that this was Talas's job. This was not Talas's job. Everything that he was discussing was DLS's doing. DLS designed this job. Remember, the contract specifically says that Talas is interested, I quote, only in the results obtained. DLS designed this job. It was DLS's workers' negligence that caused the accident. But the PIC worked for Talas, didn't it? The PIC, you have to have—under the federal regs, you have to have a PIC. But under the agreements, the job safety analysis, the JSA that you heard so much about, it's the responsibility of the contractor to fill that out. And in fact, Mr. DeLue did fill it out for DLS. And similarly, the hot work permit, it's the responsible party that is here, the party doing the work, DLS, to get the hot work permit. Now, the owner has to approve, has to grant the permit, but it's the responsibility of the party doing the work to get the permit. And the only reason that the hot work permit was such an issue in this case was because they wanted to tie it in to their theme that Talas was a convicted felon. Because as you heard repeated here, their argument was that they had a felony conviction for doing improper hot work. There is nothing in this record that substantiates that. There is no evidence of a felony conviction against Talas for doing improper hot work. There wasn't a, the testimony was that there was a hot work permit and that it was lost. There was certainly a hot work permit. Your Honor, we don't know why there wasn't a duplicate. I can't explain why there wasn't a duplicate. We do know that there was a hot work permit the previous day. There was nothing different about this day. And the purpose of the hot work permit is to look for sources of ignition, to avoid something flammable being set off. Here, there's nothing about a hot work permit that would relate in any way to preventing this accident. This accident was caused because they were simultaneously cutting and lowering pipe, because they lowered pipe over another worker, because that worker entered the barricaded area under a suspended load, and because they were pushing off the cut pipe off the scaffold. And the last point that I'll make, because it was suggested that, and I apologize I'm over time if I can just make this one point, it was suggested that there was no evidence of that. Well, Mr. Minzer testified at ROA 11846. He was the person that cut the pipe. I had to kick the pipe, I'm paraphrasing, not quoting, off because we had wrapped the rope around the scaffolding to act as a brake. So when we pushed the pipe off, it free fell, and that's what shock loaded the rope. The rope, our expert found, would have withstood up to 1,180 pounds if it had not been degraded by repeated shock loading. So these are the things that caused this accident. There is no evidence that TALAS authorized these things, which is what the court would have to find to find an exception to the independent reverse. All right. Thank you, Mr. Stern. Thank you. The court will take this matter under advisory.